<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CITIZENS BANK, N.A., <br><br> Plaintiff, <br><br> v. <br><br> NOSTRUM LABORATORIES, INC., and NOSTRUM PHARMACEUTICALS, LLC, <br><br> Defendants. | Civil Action No. 23-20765 (GC) (JTQ) <br><br> <u>**OPINION**</u> |

<u>**CASTNER, U.S.D.J.**</u>

    **THIS MATTER** comes before the Court upon Plaintiff Citizens Bank, N.A.'s Motion to Appoint Receiver pursuant to Federal Rule of Civil Procedure ("Rule") 66.  (ECF No. 11.) Defendants Nostrum Laboratories, Inc., and Nostrum Pharmaceuticals, LLC, opposed, and Plaintiff replied.  (ECF Nos. 30 & 35.)  The Court held an evidentiary hearing on April 22, 2024, and the parties submitted post-hearing objections, proposed findings of fact, and conclusions of law on May 6, 2024.  (ECF Nos. 77-83.)  The Court has carefully considered the parties' submissions and for the reasons set forth below, and other good cause shown, Plaintiff's motion is **GRANTED** in part and **DENIED** in part.  Specifically, the Court will appoint a special fiscal agent to supervise Nostrum Laboratories, Inc., and to report to the Court and the parties on a regular basis as to the company's financial status as well as the value and disposition of its business assets.

I.    **BACKGROUND**

A. **PROCEDURAL BACKGROUND**

In January 2023, Plaintiff Citizens Bank, N.A., sued Nirmal Mulye, President and Chief Executive Officer of Defendants Nostrum Laboratories, Inc., and Nostrum Pharmaceuticals, LLC, in the United States District Court for the District of New Jersey. (Civil Action No. 23-00545, ECF No. 1.) Plaintiff alleged that in December 2020 it had extended to Nostrum Laboratories, a generic pharmaceutical manufacturer, three credit facilities totaling $22 million and that Mulye had agreed to individually guarantee the loans. (*Id.* ¶¶ 10, 13.) Plaintiff sued Mulye under theories of breach of contract, promissory estoppel, and unjust enrichment for default. (*Id.* ¶¶ 38-54.)

Eight months later, on September 28, 2023, Plaintiff brought this suit against Nostrum Laboratories and Nostrum Pharmaceuticals, the parent of Nostrum Laboratories.[1] (ECF No. 1.) Plaintiff seeks repayment of the loans in the total amount of just under $17 million (inclusive of principal and interest). (*Id.* ¶¶ 10, 41.) Plaintiff asserts the following causes of action: Count One against Nostrum Laboratories for breach of contract; Count Two against Nostrum Pharmaceuticals for breach of contract; Count Three against Nostrum Laboratories and Nostrum Pharmaceuticals for promissory estoppel; Count Four against Nostrum Laboratories for unjust enrichment; and Count Five against Nostrum Pharmaceuticals for unjust enrichment. (*Id.* ¶¶ 43-79.)

Before Defendants answered, Plaintiff filed a motion to appoint a receiver on October 6, 2023. (ECF No. 11.) Plaintiff asks the Court to appoint Vladimir Kasparov of Portage Point Partners as the receiver over Nostrum Laboratories and its collateral, granting to the receiver authority to take complete and exclusive possession of them with the option of selling them to

---

[1]    Subject-matter jurisdiction is based on diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). (*See* ECF No. 1 ¶¶ 3-7; ECF No. 6; ECF No. 76.)

secure repayment of Plaintiff's loans.  (ECF No. 17.)  Defendants opposed the motion on November 20, 2023, and Plaintiff replied on November 27, 2023.  (ECF Nos. 30 & 35.)

On November 3, 2023, Defendants answered the Complaint and asserted affirmative defenses.  (ECF No. 26.)

On February 1, 2024, Plaintiff filed a motion to expedite the receivership motion, which asked the Court to hold a show cause hearing on why the request for the appointment of a receiver should not be granted.  (ECF No. 39.)  Defendants opposed the motion to expedite.  (ECF No. 49.)

On February 16, 2024, the Court held a telephonic conference with counsel for the parties and then entered an order directing them to meet and confer and to provide correspondence on two issues: (1) whether the parties would agree to the appointment of a special fiscal agent to monitor Nostrum Laboratories' financial affairs, and (2) what limited discovery Defendants requested prior to an evidentiary hearing on the motion to appoint a receiver.  (ECF No. 51.)  The parties subsequently submitted correspondence indicating that they did not agree on a fiscal agent and outlining their respective positions on the limited discovery.  (ECF Nos. 53-59.)

On March 19, 2024, the Court issued an order granting in part and denying in part Defendants' request for pre-hearing discovery and scheduling an in-person evidentiary hearing for April 22, 2024.  (ECF No. 61.)

The evidentiary hearing included testimony from five witnesses.  (ECF Nos. 73 & 95.) Plaintiff called Erin Kane, Assistant Vice President of Citizens Bank; Eric Slone, of Kenneth J. Dalto & Associates; and Vladimir Kasparov, Managing Director of Portage Partners.  Defendants called James Grainer, Chief Financial Officer of Nostrum Laboratories and Nostrum Pharmaceuticals, and Nirmal Mulye, Chairman of the Board and Chief Executive Officer of

Nostrum Laboratories and President of Nostrum Pharmaceuticals.  The parties agreed to the admission of over fifty exhibits with objections reserved on several exhibits.[2]

On May 6, 2024, the parties filed proposed findings of fact and conclusions of law.  (ECF Nos. 81-83.)  The parties also filed briefs on objections to certain exhibits as well as the report and testimony of Eric Slone.  (ECF Nos. 77-80.)

After obtaining leave of the Court, Plaintiff filed a certification on June 14, 2024, representing that during the first quarter of 2024, Nostrum Laboratories' reported balance of accounts receivables declined by over one million dollars while its over-advance grew by approximately $750,000.00.  (ECF No. 89.)  Defendants filed their response on June 20, 2024, arguing that Plaintiff had "mischaracterize[d] the accounts receivables" by relying on gross receivables that do "not accurately represent the receivables reported on Nostrum's balance sheet that will ultimately be converted into cash."  (ECF No. 92 at 1-2.)  Defendants also argued that the borrowing base certificates "ignore[] certain account receivables" and do "not represent the true collateral value of" assets.  (*Id.* at 2-3.)

**B.  FACTUAL FINDINGS[3]**

On December 31, 2020, Plaintiff's predecessor, Investors Bank, extended three credit facilities to Nostrum Laboratories via a Loan Agreement: (1) a $12 million revolving line of credit; (2) a $5 million credit/term loan; and (3) a $5 million term loan.  (Tr. 13:1-4; Exh. P-1, A-1 & B-

---

[2]     The parties emailed the Court a joint exhibit list following the hearing confirming the exhibits they agreed to admit and those on which objections were reserved.

[3]     The Court relies on the testimony at the April 22, 2024 evidentiary hearing and admitted exhibits for its factual findings.

1 to -3.[4])  Nirmal Mulye is an individual guarantor of the loans and Nostrum Pharmaceuticals is a corporate guarantor.  (Tr. 14:14-16; Exh. P-1, A-1.)

As collateral for the loans, Nostrum Laboratories granted a perfected security interest in its business assets, including but not limited to Nostrum Laboratories' accounts, goods, trademarks, contract rights, as well as proceeds and products.  (Tr. 13:5-21; Exh. P-1, C-1.)  The Uniform Commercial Code filing perfecting the lien on business assets was recorded in New Jersey.  (Tr. 13:16-21; Exh. P-1, C-2.)

On June 2, 2022, counsel for Plaintiff sent Nostrum Laboratories, Nostrum Pharmaceuticals, and Mulye a letter that served "as formal notice of the occurrence of certain Defaults and Events of Default under the Loan Agreement."  (Tr. 25:3-26:9; Exh. P-4.)  The defaults and events of default included "failure of the Borrower to satisfy the minimum required Debt Service Coverage Ratio, Fixed Charge Coverage Ratio and Total Funded Debt to EBITDA[5] ratio as of the fiscal year ending December 31, 2021," as well as the failure of the borrower and individual guarantor to provide various financial statements, certificates of compliance/no default, and tax returns.  (*Id.*)

On June 30, 2022, Plaintiff entered into a letter agreement with Nostrum Laboratories, Nostrum Pharmaceuticals, and Mulye that granted an extension of the loans' maturity date to August 15, 2022.  (Tr. 27:2-13; Exh. P-1, A-6.)  The loans were not repaid on August 15.  (Tr.

---

[4]     "Tr." Refers to the transcript of the April 22, 2024 evidentiary hearing, which can be found at ECF No. 95.  "P-" refers to Plaintiff's exhibits, and "D-" refers to Defendants' exhibits.

[5]     EBITDA stands for earnings before interest, taxes, depreciation, and amortization. According to testimony adduced during the evidentiary hearing, EBITDA "is a measurement of [operating] cash flow," and it is important because cash flow "allows the company to continue operating" and is "a measurement of the performance of a company and the ability of a company to generate cash," measuring what is being produced and if a company is "making money off that activity."  (Tr. 37:7-15, 117:15-18.)

28:2-4.)  Instead, Plaintiff and Defendants negotiated a forbearance agreement to extend the time to repay the indebtedness.  (Tr. 28:5-19; Exh. P-6.)

On October 31, 2022, Plaintiff entered into the forbearance agreement with Nostrum Laboratories, Nostrum Pharmaceuticals, and Mulye.  (Exh. P-1, G; Tr. 31:14-32:2.)  Plaintiff agreed "to forbear from exercising the rights and remedies available to it as a result of the Existing Defaults, until" December 2, 2022, at the latest, at which point Nostrum Laboratories was obligated to repay its indebtedness.  (Exh. P-1, G at 6-8; Tr. 30:5-23, 32:3-5.)  The forbearance agreement acknowledges that Nostrum Laboratories, Nostrum Pharmaceutical, and Mulye were "in default of their obligations under the Loan Documents" and that Plaintiff had "and shall continue to have, valid, enforceable and perfected first priority security interests in and liens upon the Collateral."  (Exh. P-1, G at 4-5.)  The agreement states that as of October 24, 2022, Plaintiff was owed $17,226,584.80 in principal and interest on the loans.  (*Id.* at 5-6.)  The agreement also states that "[n]othing contained [t]herein shall be deemed to obligate [Plaintiff] to enter into any other forbearance agreements or to waive any Events of Default."  (*Id.* at 14.)

On December 6, 2022, Plaintiff sent a letter to Nostrum Laboratories, Nostrum Pharmaceuticals, and Mulye that informed them that "the Forbearance Agreement expired on December 2, 2022, at which point [they] were obligated, and failed, to repay the entire amount of the Bank Indebtedness," including outstanding interest.  (Tr. 33:13-34:6; Exh. P-7.)

On January 30, 2023, counsel for Plaintiff sent Nostrum Laboratories, Nostrum Pharmaceuticals, and Mulye a letter reminding them that "the entire Bank Indebtedness [was] presently due and owing."  (Tr. 38:19-39:24; Exh. P-8.)  Plaintiff wrote that it intended "to immediately pursue certain rights and remedies, including . . . to institute suit against the Individual Guarantor to collect the outstanding Bank Indebtedness."  (*Id.*)  The next day, January 31, 2023, Plaintiff filed suit against Mulye in the United States District Court for the District of New Jersey

6

to collect the outstanding loan balance.  *See Citizens Bank, N.A. v. Mulye*, Civil Action No. 23-00545 (D.N.J.).

On February 6, 2023, Ken Dalto of Dalto Consulting, Inc.—a professional services firm that assists distressed businesses with restructuring—contacted Plaintiff on behalf of Nostrum Laboratories to outline a refinancing plan.[6]  (Tr. 110:1-11:21; Exh. P-9.)  Dalto requested six months to give Nostrum Laboratories time to secure new credit financing.  (*Id.*)  The plan included contacting an estimated 200 to 250 lenders.  (*Id.*)  The request for a six-month forbearance was rejected by Plaintiff on February 9, 2023.  (Tr. 41:21-42:7; Exh. P-23.)

Nostrum Laboratories did not follow through on Dalto's advice and did not prepare a refinancing plan to repay Plaintiff in full.  (Tr. 111:22-23, 112:21-24, 118:9-17.)  Instead, the strategy as described in an email from Mulye was to "focus on getting a settlement conference with the bank so they can come up with the number that they will settle for."  (Tr. 119:1-121:12; Exh. P-17.)

In February 2023, Plaintiff was asked to participate in "an all-hands meeting."  (Tr. 42:8-43:4; Exh. P-23.)  Plaintiff agreed to a meeting conditioned on the receipt of certain information, including a "detailed analysis of the accounts receivable, inventory, equipment, ANDAs[7] and associated intellectual property."  (*Id.*)  Plaintiff emphasized that its agreement to a meeting did not "constitute a forbearance or . . . a waiver of any of the bank's rights and remedies."  (Tr. 43:5-16; Exh. P-23.)

---

[6]    As required by the forbearance agreement, Nostrum Laboratories selected Dalto Consulting to serve as restructuring consultant.  (Tr. 102:13-19; Exh. P-1, G at 7-8.)

[7]    *See Dr. Reddy's Lab'ys, Inc. v. Thompson*, 302 F. Supp. 2d 340, 343 (D.N.J. 2003) ("Companies desiring to produce and sell generic versions of already-approved new drugs, however, need not submit the same testing data.  Instead, generic drug makers file abbreviated new drug applications (ANDAs), the contents of which are set by the statute, that include data showing the generic drug to be the same as or the bioequivalent of an FDA-approved drug.").

On May 9, 2023, Dalto Consulting was informed by Nostrum Laboratories that due to "cash flow issues," the company could not pay Dalto Consulting's hourly fees and that Nostrum Laboratories wanted to stop using Dalto Consulting to seek financing until the company could "come up with a plan." (Exh. P-25.)

On July 7, 2023, Nostrum Laboratories confessed to judgment in the Supreme Court of the State of New York for $1,040,000.00 owed to its former logistics provider Eversana Life Science Services, LLC. (Tr. 291:5-13; Exh. P-18.)

On July 10, 2023, Ken Dalto of Dalto Consulting sent Plaintiff's representatives an email stating that "[b]ased on [their] observation and analysis of the Nostrum situation for the past eight months, it [was Dalto's] informed opinion that the company is deeply insolvent, with a myriad of financial, operational and legal problems such that the company cannot be turned around." (Tr. 48:11-49:6; Exh. P-10.) The email characterized Nostrum Laboratories' debt as "staggering," referred to its financial management practices as "financial firefighting," and stated the opinion that the collateral was "likely deteriorating in excess of reporting." (*Id.*)

The last payment that Nostrum Laboratories made to Plaintiff on the outstanding loans was approximately $240,000.00 in July 2023. (Tr. 62:5-10, 68:24-69:2, 266:17-19; Exh. D-108.) Nostrum Laboratories has made no payment since then. (Tr. 50:21-23.) The amounts that Nostrum Laboratories maintains in its depositary accounts at Citizens Bank are typically under $100,000.00 and insufficient to debit for loan payments. (Tr. 63:10-64:1.)

On September 26, 2023, counsel for Plaintiff sent correspondence to Mulye, Nostrum Laboratories, and Nostrum Pharmaceuticals notifying them that Plaintiff intended to file "suit against Borrower and Pharma and a motion for the appointment of a receiver over the Borrower's assets and business." (Exh. P-24.)

Two days later, on September 28, 2023, Plaintiff initiated the present case.

On October 25, 2023, Nostrum Laboratories signed an agreement with the United States Department of Justice ("DOJ").  (Tr. 22:13-23:18; Exh. P-11.)  Nostrum Laboratories promised to pay the DOJ proceeds of certain collateral, including fifty percent of any repayment from a loan to Asia Pacific Investment Holdings Limited, twenty-five percent of any payments from certain insurance policies, and five percent of the company's EBITDA.  (*Id*.)

As of March 2024, the outstanding principal and interest on Plaintiff's loans to Nostrum Laboratories exceeded $17.1 million.  (Tr. 14:2-8.)

## II.   <u>LEGAL STANDARD</u>

The appointment of a receiver is governed by Federal Rule of Civil Procedure 66.  Federal courts sitting in diversity have typically applied federal law when determining whether to appoint a receiver.[8]  *See, e.g.*, *Midwest Bank v. Goldsmith*, 467 F. Supp. 3d 242, 248 (M.D. Pa. 2020) ("[A] federal court sitting in diversity must apply federal law when determining whether to appoint a receiver."  (collecting cases)); *Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 610 (D.N.J. 2012) ("In diversity suits, federal law governs the issue of whether a receiver should be appointed."); *Nissan Motor Acceptance Corp. v. Infiniti of Englewood, LLC*, Civ. No. 18-17228, 2023 WL 5321035, at *2 (D.N.J. Aug. 17, 2023) (same); *FTE Networks, Inc. v. Szkaradek*, Civ. No. 22-785, 2023 WL 8650002, at *5 (D. Del. Dec. 14, 2023) (same).

Although a district court has the discretion to "appoint a receiver in a proper case," such as "to avert . . . loss of assets through waste and mismanagement,"[9] *Tanzer v. Huffines*, 408 F.2d 42,

---

[8]     Both parties in this case agree that federal law should apply to the motion to appoint a receiver.  (*See* ECF No. 82 at 20; ECF No. 83 at 5.)

[9]     *See also Deutsche Bank Tr. Co. Americas v. Greenfield of Perkiomen Valley, LLC*, Civ. No. 23-1439, 2024 WL 38040, at *2 (E.D. Pa. Jan. 3, 2024) ("The purpose of a receivership is to secure, manage, protect, and preserve the property at issue.").

43 (3d Cir. 1969), a receivership is "an extraordinary, a drastic and . . . an 'heroic' remedy," *KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*, 781 F. App'x 119, 122 (3d Cir. 2019) (quoting *Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942)). *See also Manufacturers & Traders Tr. Co. v. Minuteman Spill Response, Inc.*, 999 F. Supp. 2d 805, 816 (W.D. Pa. 2013) ("Because a receiver 'unquestionably interfere[s]' with an individual's right to otherwise control his or her property, a district court should appoint a receiver only 'in cases of necessity, and when the plaintiff clearly and satisfactorily shows that an emergency exists and the receiver is needed to protect the property interests of the plaintiff.'" (quoting *Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 825 (3d Cir. 1959))).  Accordingly, before appointing a receiver, courts should consider, among other things, "whether 'milder measures will give the plaintiff . . . adequate protection for his rights." *KeyBank Nat'l Ass'n*, 781 F. App'x at 122 (quoting *Maxwell*, 131 F.2d at 403).  And courts must "articulate[] the legal principles and factual bases that justif[y] imposing a receivership." *Id.*  "[T]he party seeking appointment . . . bears the heavy burden of justifying the need for a receiver." *U.S. Bank Nat'l Ass'n v. B-R Penn Realty Owner, LP.*, Civ. No. 21-0502, 2021 WL 1721863, at *2 (E.D. Pa. Apr. 29, 2021).

There is no precise formula for determining when a receiver should be appointed,[10] but as "a general rule, . . . receivers are appointed only when the party seeking receivership has 'an equitable interest in the property to be seized or . . . judgments that cannot otherwise be satisfied,'" and there is either "a showing of fraud or the imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate." *Leone Indus. v. Associated Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992) (quoting *Piambino v. Bailey*, 757

---

[10]    *See, e.g.*, *Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) ("[T]here is 'no precise formula for determining when a receiver may be appointed.'"  (citation omitted)).

F.2d 1112, 1131 (11th Cir. 1985)); *see also Julius Realty Corp. v. Thompson*, Civ. No. 20-04575, 2022 WL 2981003, at *7 (D.N.J. July 28, 2022).

To aid in the determination, district courts in this Circuit have distilled a fuller list of nine factors that may be considered: "(1) the probability of the plaintiff's success in the action; (2) the possibility of irreparable injury to the plaintiff's interests in property; (3) the inadequacy of the security to satisfy the debt; (4) the probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim; (5) the financial position of the debtor; (6) the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; (7) the inadequacy of the available legal remedies; (8) the lack of a less drastic equitable remedy; and (9) the likelihood that appointing a receiver will do more harm than good." *Value Drug Co. v. Only One Hub, Inc.*, Civ. No. 23-00263, 2023 WL 8540912, at *5 (W.D. Pa. Dec. 11, 2023) (citing *Manufacturers*, 999 F. Supp. 2d at 816); *see also Fimbel v. Fimbel Door Corp.*, Civ. No. 14-1915, 2016 WL 1379788, at *3 (D.N.J. Apr. 7, 2016) (explaining that the "nine equitable factors, compiled from the case law of multiple circuits," may be considered by a district court "to determine whether it is appropriate to appoint a receiver").

Ultimately, the "form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion." *KeyBank Nat'l Ass'n v. Fleetway Leasing Co.*, Civ. No. 18-667, 2019 WL 5102206, at *5 (E.D. Pa. Oct. 11, 2019) (quoting Wright & Miller, 12 Fed. Prac. & Proc. Civ. § 2983 (3d ed. 2019)); *accord U.S. Bank Nat'l Ass'n*, 2021 WL 1721863, at *1 n.1. Indeed, courts have referred to the procedures that govern receivership motions as "less formal" than trial or summary judgment and more "akin" to "a motion for a preliminary injunction." *Julius Realty Corp. v. Thompson*, Civ. No. 20-4575, 2023 WL 2728786, at *3 (D.N.J. Mar. 31, 2023); *Fimbel*, 2016 WL 1379788, at *2 ("[B]ecause Plaintiffs seek interim equitable relief, akin to a motion for preliminary injunction, the Court is not bound by the strict

rules governing evidence at trial or summary judgement, and therefore, may consider the evidence presented by Plaintiffs."); *see also Miller v. Fisco, Inc.*, 376 F. Supp. 468, 470 (E.D. Pa. 1974) ("[T]he instant motion is more akin to a motion for injunctive relief than to a motion to dismiss for failure to state a claim.").  Courts, for example, have granted receivership motions without holding an evidentiary hearing, so long as the record contained sufficient facts to justify the appointment.  *See, e.g.*, *Cornerstone Realty Partners, Inc. v. Rabolli*, Civ. No. 15-7393, 2017 WL 1243142, at *1 (D.N.J. Mar. 17, 2017) ("An evidentiary hearing need not be held beforehand when the record discloses sufficient facts to warrant appointment of a receiver."); *Kacmarski v. Eppehimer*, Civ. No. 13-07522, 2014 WL 7404538, at *2 (D.N.J. Dec. 30, 2014) (same).

## III.   DISCUSSION

### A.  EVIDENTIARY OBJECTIONS

Following the evidentiary hearing, the parties filed objections to certain exhibits and testimony.  Plaintiff objected to three proposed exhibits from Defendants, and Defendants objected to expert testimony and a report submitted by Plaintiff.  (ECF Nos. 77-80.)  The Court will address the objections before proceeding to the merits of the receivership motion.

#### 1.  DEFENDANTS' EXHIBITS

Plaintiff objects to three proposed exhibits from Defendants: D-93, D-131, and D-152.

D-93 is a March 2024 email exchange between James Grainer, Nostrum Laboratories' Chief Financial Officer, and Bob Schnitzer of Rosenthal & Rosenthal, Inc., titled "Projections." (Exh. D-93.)  Attached to the email exchange is an Excel sheet that purports to project Nostrum Laboratories' profits and losses, balance sheet, and cash flows for 2024, but Defendants indicate that they are offering the exhibit simply to show "due diligence efforts are being made for the purpose of providing refinancing" to Nostrum Laboratories.  (ECF No. 78 at 1.)  Plaintiff objects to D-93 on the ground that the exhibit was not introduced at the evidentiary hearing and was,

instead, merely referenced by Defendants' counsel as an "important" exhibit.  (ECF No. 79 at 1.)  Plaintiff argues that it "was not afforded an opportunity to ask any witness about the email."  (*Id.*)  Defendants submit a certification from Grainer who attests that the email exchange was "in connection with Rosenthal Inc.'s pending due diligence efforts . . . to consider providing [Nostrum Laboratories] with substitute funding" for the loans owed to Plaintiff.  (ECF No. 78-2 ¶ 4.)  And Defendants write that Nostrum Laboratories "is engaged in due diligence efforts with other prospective lenders as well."  (ECF No. 78 at 1.)  Even if the Court were to consider the email exchange at D-93, it is redundant.  There was testimony at the evidentiary hearing from Grainer and Mulye about Nostrum Laboratories' attempts to secure alternative financing to repay Plaintiff, (*see* Tr. 296:14-297:10, 312:6-8, 312:21-313:16), and the email exchange does not contribute anything material on that issue.  There is no indication that Rosenthal, Inc., has agreed or is on the verge of agreeing to provide financing to Nostrum Laboratories, and the testimony of the witnesses is sufficient to show that Defendants are trying to secure other prospective lenders.

D-131 is a "draft" audit report, dated "December 31, 2022," said to have been prepared by Ram Associates, CPAs, of Hamilton, New Jersey.  (Exh. D-131.)  The word "draft" is stamped in the middle of every page, and the report appears to be an analysis of Nostrum Laboratories' consolidated financial statements for 2022.  (*Id.*)  Plaintiff objects to the exhibit on the ground that it is unauthenticated, "lacks any foundational testimony," and is "unaccompanied by any sworn testimony from the purported author."  (ECF No. 79 at 2.)  Defendants do not contest Plaintiff's objections but note that there is now a final draft of the 2022 report available.  (ECF No. 78 at 1-2.)  Because D-131 is an unauthenticated "draft" report that is now supplanted by a final report, the Court will not consider the draft report for the present motion.

D-152 is the final audit report, dated "December 31, 2022," from Ram Associates.  (Exh. D-152.)  Plaintiff does "not object to Nostrum's use of D-152 to show that an audit was obtained,"

but it objects to use of the audit report "for any other purpose." (ECF No. 79 at 2.)  Plaintiff notes that it received the report only days before the evidentiary hearing and that the report's author did not testify during the hearing. (*Id.*)  Defendants write that Nostrum Laboratories "endorses the statements in D-152" and that it confirms "Nostrum's solvency." (ECF No. 78 at 1-2.)  The Court will accept D-152 for the purposes of showing that a 2022 audit report was completed in April 2024, but the Court cannot rely on the report to "confirm" Nostrum's solvency as of 2024.  Not only was there no testimony from the report's author nor did any witnesses at the evidentiary hearing testify about how the report demonstrates Nostrum Laboratories' solvency, but the report covers the period that ended on December 31, 2022, and does not prove that Nostrum Laboratories is or has been solvent after that date.

## 2. *PLAINTIFF'S EXPERT TESTIMONY AND REPORT*

Defendants object to Plaintiff's witness, Eric Slone, being qualified as an expert and his report, P-20, being admitted as an expert report. (ECF No. 77.)  Defendants emphasize that Slone "does not have experience working with generic pharmaceutical manufacturers" and that he "had insufficient facts and data relating to Nostrum's finances after June of 2023." (*Id.* at 1-3.)  Defendants also fault Slone for failing to obtain "facts and information necessary to form an informed opinion, on a number of subject matters, including those relating to Nostrum's financial reporting, financial projections, accounts payables, and relationships with its business partners and suppliers." (*Id.* at 3-4.)

Plaintiff responds that Slone "has been a certified public accountant for over 40 years and a certified insolvency and restructuring advisor for 20 years" and that he "has advised hundreds of financially distressed businesses . . . regarding restructuring their businesses and managing financial crises." (ECF No. 80 at 1.)  Plaintiff notes that Defendants did not object to Mr. Slone testifying as an expert prior to the evidentiary hearing, despite the Court directing the parties to

raise any objections at that time.  (*Id.* at 2-3.)  Plaintiff further notes that it is not offering Slone "as a generic pharmaceutical expert," but "as an expert in accounting and business restructuring," and it argues that Slone "need not have specialized experience in the pharmaceutical industry to opine that Nostrum's inability to pay its debts as they come due renders it insolvent."  (*Id.* at 3-4.) Finally, Plaintiff argues that Slone "testified he received and reviewed Nostrum's financial[s] for all periods relevant to his opinion testimony; therefore, he possessed the information upon which his conclusions are based."  (*Id.* at 5.)

Upon careful review, the Court finds that Slone is qualified to testify as an expert in accounting and business restructuring, and it will accept his report, P-20, for that purpose. Defendants' objections to Slone's lack of specialized experience with generic pharmaceutical manufacturers as well as the other critiques of Slone's knowledge about Nostrum Laboratories' processes go to the weight that should be given to Slone's testimony when evaluating the financial status of Nostrum Laboratories, not the reliability of the testimony.  *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.  The judge might think that there are good grounds for an expert's conclusion even if the judge thinks that there are better grounds for some alternative conclusion, and even if the judge thinks that a scientist's methodology has some flaws such that if they had been corrected, the scientist would have reached a different result.").

Slone is clearly qualified to offer an opinion on a corporation's accounting practices and business restructuring.  Slone is Managing Director of Dalto Consulting, a certified public accountant since 1983, a certified insolvency and restructuring advisor since 2003, holds certificates in distressed business valuations and financial forensics, and graduated from Michigan State University with a degree in accountancy in 1981.  (Exh. P-15, A-1.)  He testified during the hearing that he has been involved with hundreds of audits, "consulted for hundreds of

manufacturing companies," and reviews financial statements daily, including to ensure that they comply with generally accepted accounting principles.  (Tr. 98:9-100:15, 162:5-7.)  Slone and Dalto Consulting were selected by Nostrum Laboratories to serve as their consultant in October 2022, and Slone continued to receive financial information from Nostrum Laboratories through December 2023.  (Tr. 102:10-25, 123:3-10.)

As to the reliability of Slone's methods and procedures, his opinions are based on his personal experience consulting for Nostrum Laboratories and his post-consulting review of the company's financial data.  This combined with Slone's years of experience working in accounting and business restructuring as well as his work auditing hundreds of companies are sufficient to meet the reliability requirement.  *See, e.g.*, *Equinox Properties, LLC v. Harford Mut. Ins. Co.*, Civ. No. 21-15929, 2023 WL 5447279, at *4 (D.N.J. Aug. 24, 2023) ("[I]n some cases the expert's training and experience will provide an adequate and reliable foundation to admit an opinion for consideration."); *see also Oddi v. Ford Motor Co.*, 234 F.3d 136, 158 (3d Cir. 2000) ("[T]here may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability.").  Indeed, Slone's report indicates that his opinions and conclusions were based on his review of the monthly financial reporting that Nostrum Laboratories sent Plaintiff from October 2022 through December 2023.  (Exh. P-20 at 9.)

Defendants take issue with the fact that Slone does not have specific experience with generic pharmaceutical manufacturers, but this degree of specialization is not required for an accountant to testify about the financial status of a corporation.  *See, e.g.*, *Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 782 (3d Cir. 1996) ("[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.");

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 309 (S.D.N.Y. 2015) ("The liberal construction of Rule 702 is exemplified by an experienced forensic accountant's ability to testify to the valuation of businesses without regard to the particular industry focus of those enterprises."); *Main St. Mortg., Inc. v. Main St. Bancorp., Inc.*, 158 F. Supp. 2d 510, 513 (E.D. Pa. 2001) ("We find that Biddick, although not specialized in the mortgage industry, is sufficiently qualified to make the damages estimate contained in his report.  Biddick is an experienced public accountant who has conducted valuations of various businesses and previously performed analysis similar to that done here.").  Accordingly, the Court will consider Slone's testimony and report.

### B. APPOINTMENT OF A RECEIVER

The Court examines below the factors that are relevant to the appointment of a receiver. Based on that analysis, the Court concludes that the appointment of a special fiscal agent, not a receiver, to supervise Nostrum Laboratories' business and assets and to report to the Court and the parties on a regular basis is the appropriate remedy at this time.

#### 1. EQUITABLE INTEREST

There appears to be no dispute that Plaintiff, as a secured creditor of Nostrum Laboratories' business assets, has a sufficient "legal interest" to move for the appointment of a receiver or other equitable relief.  (Tr. 13:5-21; Exh. P-1, C-1 to C-2.)  Thus, this factor weighs in favor of Plaintiff's application.  *See, e.g.*, *Stonebridge Bank v. Nita Properties, LLC*, Civ. No. 09-5145, 2011 WL 2173771, at *1 (D.N.J. June 1, 2011) ("A secured creditor has a legal interest in the property on which it has a security interest."); *see also Pusey & Jones Co. v. Hanssen*, 261 U.S. 491, 497 (1923) ("A receiver is often appointed upon application of a secured creditor who fears that his security will be wasted.").

### 2. *PROBABILITY OF SUCCESS*

On the present record, it appears that Plaintiff's probability of success on the merits of its claims is reasonably high.

The evidence indicates that the loans matured on August 15, 2022, and the parties then entered into a forbearance agreement set to expire on December 2, 2022, at which point Nostrum Laboratories was obligated to repay its indebtedness.  (Exh. P-1, A-6, G at 6-8; Tr. 27:2-13, 30:5-23, 32:3-5.)  The forbearance agreement recognized Plaintiff's continuing secured interest in Nostrum Laboratories' assets and that, as of October 24, 2022, Plaintiff was owed $17,226,584.80 in principal and interest on the loans.  (Exh. P-1, G at 4-6.)  Nostrum Laboratories and Nostrum Pharmaceuticals both acknowledged in the forbearance agreement that they were "in default [o]f their obligations under the Loan Documents as a result of," among other things, the "failure to repay the Loans in full on or before the Revolving Credit Maturity Date, which occurred August 15, 2022."  (*Id.* at 2.)  The factual record further indicates that the last payment that Nostrum Laboratories made on the loans was in July 2023, almost a year ago.  (Tr. 62:5-10, 68:24-69:2, 266:17-19; Exh. D-108.)

Defendants' primary defense is that Plaintiff impliedly extended the forbearance agreement beyond December 2, 2022, but there is currently limited support for this claim.  (ECF No. 83 at 7-9.)  The forbearance agreement stated that "[n]othing contained [t]herein shall be deemed to obligate [Plaintiff] to enter into any other forbearance agreements or to waive any Events of Default."  (Exh. P-1, G at 14.)  And on December 6, 2022, just four days after the forbearance agreement allegedly expired, Plaintiff sent a letter to Nostrum Laboratories, Nostrum Pharmaceuticals, and Mulye that informed them that they "were obligated, and failed, to repay the entire amount of the Bank Indebtedness," including outstanding interest.  (Tr. 33:13-34:6; Exh. P-7.)  Next, on February 6, 2023, Ken Dalto (then serving as Defendants' consultant) contacted

18

Plaintiff to ask for a further six-month forbearance to give Nostrum Laboratories time to secure new credit financing. (Tr. 110:1-11:21; Exh. P-9.) The request for a six-month forbearance appears to have been rejected in writing by Plaintiff on February 9, 2023. (Tr. 41:21-42:7; Exh. P-23.)

The main evidence that Defendants cite to support their contention that Plaintiff impliedly extended the forbearance agreement is a declaration from James Grainer, Nostrum Laboratories' Chief Financial Officer, who attests that Erin Kane, Assistant Vice President of Citizens Bank, "implicitly assured [him] that the term of the Forbearance Agreement would be extended based on [Nostrum Laboratories'] performance of the material terms of the Forbearance Agreement." (Exh. D-14R ¶ 5.) Yet Grainer's own declaration undermines the claim that there was an assurance of an extension when he further attests that "Ms. Kane informed [him] that she would review and *consider* granting the extension," and "[he] was assured that it was *possible* that [Nostrum Laboratories] *might* qualify for an extension of the Forbearance Agreement." (*Id.* (emphases added).) Grainer also testified that Nostrum Laboratories did not negotiate a term in the signed forbearance agreement that entitled the company to a further extension of forbearance from Plaintiff. (Tr. 262:10-19.)

On this record, that Kane may have suggested at some point that Plaintiff would "consider" an extension of the forbearance period and that it was "possible" that Nostrum Laboratories "might" obtain an extension is not strong evidence of an implied agreement, particularly when the parties' written forbearance agreement expressly stated that Plaintiff was not obligated to enter into any other forbearance agreements or to waive the defaults. *See, e.g.*, *Baer v. Chase*, 392 F.3d 609, 619 (3d Cir. 2004) ("[A]n implied-in-fact contract 'must be sufficiently definite [so] that the performance to be rendered by each party can be ascertained with reasonable certainty.'" (citation omitted)); *see also Frank Briscoe Co. v. Travelers Indem. Co.*, 899 F. Supp. 1304, 1308 (D.N.J.

1995) ("It is also well-established, as a matter of law, that the Court cannot rewrite the contract or alter it simply because its results turned out differently than the parties expected.").  An implied extension of the forbearance agreement is further undermined by the fact that Defendants, through Dalto Consulting, explicitly asked Plaintiff in February 2023 for a six-month extension that was then rejected in writing.  (*See* Tr. 41:21-42:7; Exh. P-23.)

Defendants argue that a motion to appoint a receiver is premature before a final judgment, but the caselaw they cite is inapposite.  (ECF No. 83 at 6-7.)  In many of those cases, there was more evidence raising a genuine dispute as to the issue of default than what is now before the Court.  *See, e.g.*, *Wells Fargo Bank, N.A. v. Premier Hotels Grp., LLC*, Civ. No. 14-56, 2015 WL 404549, at *9 (M.D. Pa. Jan. 29, 2015) (denying motion to appoint receiver where there were "genuine issues of material fact . . . regarding [the] alleged default"); *see also Lieberman v. Corporacion Experienca Unica, S.A.*, 226 F. Supp. 3d 451, 473 (E.D. Pa. 2016) (finding that the plaintiffs had not demonstrated probability of success by simply surviving a motion to dismiss because "surviving a motion to dismiss does not necessarily mean that the claim is likely to succeed").  The Court also notes that it allowed Defendants to take limited discovery in this case in advance of the evidentiary hearing, and Defendants have also taken discovery in the related case filed by Plaintiff against Mulye in his individual capacity.

### 3. FINANCIAL POSITION OF DEBTOR

The financial position of Nostrum Laboratories is subject to intense dispute between the parties, with each advancing competing claims about what precisely the evidence shows.  However, even construing the evidence in the light most favorable to Defendants, what is clear is that Nostrum Laboratories has struggled with cash flow issues, has been unable so far to raise

funds to repay the debts it owes Plaintiff, and (in the words of Mulye) is "going through very difficult times" in the industry.[11]  (Tr. 313:14-15.)

Plaintiff contends that Nostrum Laboratories is "insolvent" and cannot pay its debts as they become due.  (ECF No. 82 at 24-25.)  Plaintiff points to Nostrum Laboratories' latest cash flow report that reflects "staggering (and unexplained) negative deviations between projected cash on hand and actual cash on hand" as well as to financial statements indicating that Nostrum Laboratories "experienced a negative EBITDA of nearly $3 million for 2023 with an additional negative EBITDA of $612,000 for the first two months of 2024 (and an after-tax loss of $795,000 for the entire first quarter of 2024)."  (*Id.* at 27-28.)  During the evidentiary hearing, Slone testified that Nostrum Laboratories is, in his view, "severely insolvent," and his April 2024 report concluded that the company is both "cash flow" insolvent and "balance sheet" insolvent.  (Tr. 117:10-22; Exh. P-20.)  Slone opined that Nostrum Laboratories' "prolonged negative EBITDA . . . is a primary indicator of cash flow insolvency" and that its inability to make payments on the loans to Plaintiff or to "raise debt or equity to repay its indebtedness to Citizens Bank . . . is a clear sign of insolvency."  (*Id.*)

In contrast, Defendants contend that Nostrum Laboratories' "first quarter 2024 financial results show that its financial condition has improved, not worsened."  (ECF No. 83 at 9.)  While they acknowledge that Nostrum Laboratories "had cash flow problems in 2022," they claim that sales "have increased in the past year about 19-and-half percent" and accuse Plaintiff of "misleadingly cherry pick[ing] results from the last two months of 2024."  (*Id.* at 13-14.)  They argue that "[a]ny assertion that the business might be generally declining, . . . even if true, is not

---

[11]     Defendants also acknowledged in their initial briefing that Plaintiff would "at best, only establish that [Nostrum Laboratories] is financially troubled."  (ECF No. 30 at 6.)

the basis for granting the emergency relief sought" where there has not been "a catastrophic loss of its main assets." (*Id.* at 15.)

At the evidentiary hearing, Mulye testified that Nostrum Laboratories has struggled to secure financing to repay its indebtedness to Plaintiff, and in correspondence from May 2023 Mulye confirmed that, as of that time, there was "no way [he] c[ould] raise $17M and the bank should know that." (Tr. 312:21-313:2; Exh. P-17.) Mulye wrote further that the "current state of the company and the banking crisis limit[ed] the sources for getting the money as well as the amounts that c[ould] be raised." (Exh. P-17.) Nostrum Laboratories has not made any payments to Plaintiff on the loans since July 2023 nor secured refinancing from an alternative source. (Tr. 62:5-10, 68:24-69:2, 266:17-19; Exh. D-108.) Moreover, during his testimony, Grainer acknowledged that Nostrum Laboratories had a net income in the first quarter of 2024 of negative $795,000.00 and an EBITDA for 2023 of negative $2.7 million, though he emphasized that Nostrum Laboratories' EBITDA had improved by about ten million dollars since the prior period. (Tr. 271:19-272:1, 276:9-13.) Grainer also certified that Mulye had "been selling some of his personal assets and investing them in" Nostrum Laboratories "to assist with [the company's] operations." (Exh. D-14R ¶ 55.)

Nostrum Laboratories' difficulties paying its debts appear to extend beyond Plaintiff's loans. In July 2023, Nostrum Laboratories confessed to a $1,040,000.00 judgment in the Supreme Court of the State of New York owed to its former logistics provider Eversana Life Science Services, LLC. (Exh. P-18.) And the amounts Nostrum Laboratories owed to Enem Nostrum Remedies Private Limited, an India-based company that does testing and is owned by Mulye's family members,[12] increased from approximately $1.3 million in March 2023 to $4.46 million in

---

[12]    (*See* Tr. 333:9-13.)

February 2024.  (*Compare* P-26, *with* P-28 at 5.)  As of February 2024, Nostrum also reportedly owed Archimica, a company that provides Nostrum Laboratories with the raw materials to produce one of its drugs that accounts for 80% of its revenue, approximately $1.6 million, and entered into a payment plan to allow for the continued delivery of materials.  (D-149 ¶ 9; Tr. 294:2-295:5.)

On this record, the Court finds that Plaintiff has demonstrated legitimate concerns with Nostrum Laboratories' capacity to pay debts as they become due as well as its capacity to raise funds from prospective lenders to help repay Plaintiff's loans.  The record also demonstrates that Nostrum Laboratories' financial position has been unstable, and it has struggled with cash flow issues since at least 2022.  This factor therefore favors the appointment of a receiver, although it is not necessarily dispositive on its own.  *Compare Wilmington Tr., Nat'l Ass'n v. 24 Com. St. LLC*, Civ. No. 21-05498, 2021 WL 4786117, at *9 (D.N.J. Oct. 14, 2021) ("[T]he need for additional financing does speak to the Borrower's unstable financial status.  Accordingly, the Court find that this factor favors Plaintiff."), *with Miller*, 376 F. Supp. at 472 ("Even the threat of insolvency, which may be a very real threat facing Fisco, is inadequate to permit the appointment of a receiver.").

### 4. POSSIBILITY OF IRREPARABLE INJURY /DANGER OF PROPERTY BEING LOST OR DIMINISHED IN VALUE/INADEQUACY OF SECURITY

While the evidence suggests that Nostrum Laboratories' receivables and inventory have declined in value over time and may be continuing to decline, there is also evidence that suggests that the sale of some or all of Nostrum Laboratories' assets—namely, its Abbreviated New Drug Applications—would still result in sufficient cash to repay Plaintiff in full.

Plaintiff argues that the value of Nostrum Laboratories' collateral is deteriorating and that the company's "conduct reflects a disregard for the protection of [Plaintiff's] interests in its collateral." (ECF No. 82 at 28-29.)  It notes that the value "of accounts receivables has . . . declined

by over $4 million during the last year" and that the "eligible receivables are declining because the receivables are aging out of the borrowing base at a faster rate than the company can generate new receivables." (*Id.* at 29-30.)   It also notes that the value of Nostrum Laboratories' inventory declined by approximately three million dollars between August 2022 and December 2023, from approximately $5.1 million in eligible inventory in August 2022 to $2.2 million in December 2023. (*Id.* at 30.)  Plaintiff criticizes Nostrum Laboratories for its "failure to disclose the location of . . . inventory collateral and refusal to secure a warehouse waiver from its logistics provider." (*Id.* at 30.)  It also expresses concern that Nostrum Laboratories has a past due balance with its new logistics providers, which could result in a lien that would "impair Citizens' liens in that collateral." (*Id.*)  Finally, Plaintiff maintains that Nostrum Laboratories' settlement with the DOJ in October 2023, which resulted in certain collateral being pledged to the DOJ, evidenced a disregard for Nostrum Laboratories' commitments to Plaintiff.  (*Id.* at 31.)

In response, Defendants argue that "there is no possibility of irreparable injury." (ECF No. 83 at 12.)  Defendants contend that the value of their assets, "even under a forced liquidation," would be multiple times higher than what is due to Plaintiff.  (*Id.*)  Accordingly, Defendants insist that Plaintiff's claim can be satisfied through an eventual money judgment if Plaintiff prevails and without the present appointment of a receiver.  (*Id.*)  Defendants argue that Nostrum Laboratories remains "a high functioning pharmaceutical manufacturer, continuing to make and market pharmaceutical products to the public," and that it is "working to reduce its ongoing business expenses while better utilizing and expanding its product portfolio." (*Id.* at 13.)  As to the settlement with DOJ, Defendants argue that Nostrum Laboratories eliminated a fixed $34 million liability, the "net result" of which was to "improve[] dramatically" the company's "financial position" and to make it "a more attractive candidate for future" financing.  (*Id.* at 14.)

The evidence lends support to Nostrum Laboratories' claim that it has adequate collateral that could be sold to repay the loans.  A "Collateral Liquidation Analysis," prepared in March 2023 by Dalto Consulting, found that as of December 31, 2023, the net collateral value of Nostrum Laboratories' accounts receivables, inventory, property and equipment, as well as real estate was between approximately $11.2 million and $16.1 million.  (Exh. D-16 at 4.)  This included equipment at a manufacturing facility in Kansas City, Missouri, and at a second facility in Bryan, Ohio. (*Id.* at 11-12.)  In addition, Dalto Consulting estimated that Nostrum Laboratories' ANDAs had a cash value of $35.5 million, assuming that the ANDAs were "not sold in a sale of all business assets . . . in an organized M&A process with investment bankers." (*Id.* at 33.)  The report noted that there was "an argument the ANDAs have much more value on a going concern basis" and that Nostrum Laboratories' senior management had estimated the ANDAs' value at $73 million or more. (*Id.*)

During the evidentiary hearing, Slone testified that he stood by Dalto Consulting's collateral-liquidation analysis and confirmed that the estimate for receivables, inventory, and fixed assets, was based on a "forced liquidation" while the estimate for the ANDAs "was done on an orderly sale process," not a fair market value valuation.  (Tr. 180:24-181:21.)  On behalf of Nostrum Laboratories, Grainer testified that he believed that Dalto Consulting's valuation "understate[d] . . . the value of the assets" and that it was Nostrum Laboratories' view that it had "single ANDAs that would have more value than" what Dalto Consulting had assessed for all of the ANDAs together. (Tr. 221:15-23.)  Grainer was also of the opinion that Nostrum Laboratories' assets had increased in value since the collateral-liquidation analysis based on the paying down of debt on equipment and leases as well as the settlement with DOJ.  (Tr. 222:21-223:7.)

On this record, the Court cannot find that Plaintiff's interest in Nostrum Laboratories' collateral would be irreparably injured in the absence of a receivership, even if the overall value

of Nostrum Laboratories' assets has declined since the alleged defaults.  The Court appreciates Plaintiff's concerns about Nostrum Laboratories' unstable financial position and the pledges of collateral to the DOJ, but the evidence suggests that the company retains seemingly substantial value in ANDAs that could be sold to satisfy a judgment in this case.  Kane, Assistant Vice President at Citizens Bank, acknowledged during her testimony that "there is potentially significant value in ANDAs" but noted that Dalto Consulting's valuation had been completed in 2023 and that Nostrum Laboratories' "management team [had] exhibited no ability to monetize or realize any value from any of the ANDAs in the time" that she had been involved in the matter. (Tr. 45:9-46:3.)  While Plaintiff's concerns may be fair, they must be weighed against the March 2023 analysis from Dalto Consulting (the expert that Plaintiff now relies on in this case) that concludes that the ANDAs may be worth more than twice what is currently owed to the lender, even when the ANDAs are not sold for fair market value.  *See, e.g.*, *Manufacturers & Traders Tr. Co.*, 999 F. Supp. 2d at 826 (denying the appointment of a receiver where the evidence did not show that the "substantial collateral interests would not adequately cover any monetary loss to M & T Bank"); *U.S. Bank Nat'l Ass'n*, 2021 WL 1721863, at *3 ("'[S]omething more than just the doubtful financial standing of the defendant and the inadequacy of the security' is required where, as here, Lender seeks a receiver to 'manage and operate the mortgaged property pending foreclosure.'"  (citation omitted)).

### 5. *FRAUDULENT CONDUCT*

Plaintiff identifies inconsistencies in Nostrum Laboratories' financial reporting and overly rosy projections that raise genuine questions as to whether the company has tried to present a slanted picture of its financial position.  Specifically, Plaintiff offered testimony and other evidence to support its claim that financial projections prepared by Nostrum Laboratories in December 2022 were knowingly unrealistic based on timeframes associated with the approval of new ANDAs and

other revenue, yet Nostrum Laboratories did not take steps to correct those projections.  (ECF No. 82 at 35-36.)  Plaintiff also contends that Nostrum Laboratories inflated its inventory in violation of generally accepted accounting principles, overstated the value of its assets on its books and records, and misrepresented over four million dollars of invoices to Cardinal Health as "new shipments of finished goods" that led to inflated eligible receivables in May 2023.  (*Id.* at 36-37.)  In response, Defendants contend that Plaintiff's allegations "were manufactured for the purposes of this motion" and "reveal a complete lack of understanding of the highly regulated nature of the pharmaceutical industry."  (ECF No. 83 at 16-19.)  Defendants argue that Nostrum Laboratories' financial projections were reviewed with Dalto Consulting and were not "fantastical" based on the assumptions at that time.  (*Id.* at 18.)  They also argue that Nostrum Laboratories' accounts receivables data, including as to Cardinal Health, and its valuation of inventory and assets were proper and consistent with "industry wide reconciliation process."  (*Id.* at 17-18.)

Having considered the documentary evidence and testimony, the Court finds that Plaintiff has presented credible evidence that the financial projections presented by Nostrum Laboratories in December 2022 were potentially not realistic based on information that was then-known to it and that there are legitimate questions about how Nostrum Laboratories characterized the invoices to Cardinal Health in May 2023.  This favors Plaintiff, though the Court does not find that it rises to the level of fraud or presently necessitates the appointment of a receiver.  *See, e.g.*, *William J. Mansfield, Inc. v. Udren L. Offs., P.C.*, Civ. No. 18-03569, 2019 WL 1442618, at \*1 (E.D. Pa. Mar. 22, 2019) (finding a receiver not warranted where the plaintiff "expresse[d] concern that [the defendant's] lack of transparency about its finances may portend future fraudulent conduct").

### 6. *INADEQUACY OF AVAILABLE LEGAL REMEDIES*

Plaintiff argues that the appointment of a receiver with the power to sell Nostrum Laboratories' assets is the only adequate legal remedy because Nostrum Laboratories "cannot

repay its creditors absent a sale or liquidation," and the company's refusal to "comply with its contractual obligations" places Plaintiff's "interests in the collateral" at "unnecessary risk and further diminution during the pendency of this action." (ECF No. 82 at 39-40.)   The Court appreciates Plaintiff's desire to secure the value of assets as early as possible, but it does not find that Plaintiff has shown that no other legal remedies are adequate at this stage in the litigation. Based on the record before it, the Court is not convinced that the substantial value that Nostrum Laboratories apparently possesses in its ANDAs could not be secured following a judgment. The key is not to prematurely take equitable action but to put in place an interim mechanism to protect Plaintiff's interests while allowing the case to progress. *Cf. Hipple v. Hipple*, Civ. No. 12-1256, 2016 WL 1449231, at *2 (E.D. Pa. Apr. 13, 2016) (appointing receiver to sell patents where time was "of the essence" because the patents were set to "expire in the near future" and the defendant had not complied with judicial "order to reinstate and sell the patents").

### 7. *MILDER EQUITABLE REMEDY/LIKELIHOOD OF MORE HARM THAN GOOD*

Based on the above, the Court does not find that a receiver is currently warranted, and there is a threat that the appointment of a receiver and the possible liquidation of Nostrum Laboratories' business would do more harm than good. Among other things, a receiver taking control of Nostrum Laboratories may result in the loss of institutional knowledge, closing of manufacturing facilities, breakdown in business relationships, and difficulty continuing to conduct business. Nevertheless, while a receiver may be too "drastic" a remedy, the equitable factors support the appointment of a special fiscal agent to oversee and monitor Nostrum Laboratories' operations and assets and to provide regular reports to the Court and the parties.

The discretion to appoint a special fiscal agent where a receiver may not yet be warranted is well settled. In *Fimbel v. Fimbel Door Corporation*, for example, the district court explained that "some courts opt to appoint a special fiscal agent, rather than a receiver, because a special

fiscal agent is a 'less dramatic' and 'less intrusive device' than a receiver."  2016 WL 1379788, at
*4 (quoting *Leone Indus.*, 795 F. Supp. at 120).  Indeed, fiscal agents "'are generally appointed to
monitor corporate record keeping or to prevent the erosion of assets on behalf of shareholders' or
other plaintiffs."  *Id.* (quoting *In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp.
450, 560 (D.N.J. 1997)).  There, the court found the appointment of a fiscal agent justified where
there was "ample evidence" that the company had a "habit of making unsecured loans . . . without
formalizing these transfers through notes or loan agreements" and had failed "to maintain basic
documentation of its transactions," indicating that the plaintiffs' "interests [were] at risk of loss
through neglect, at best, and through fraud, at worst."  *Id.* at *7.  The court also highlighted
"questions surrounding the financial positions" of the company and the effect on "the security of
Plaintiffs' interests."  *Id.*

Similarly, in *Julius Realty Corporation v. Thompson*, the district court noted that "[s]pecial
fiscal agents are appropriate where close supervision, but not control, is necessary."  2022 WL
2981003, at *7.  And there, given "concerns about cash outflows" from the company and its
"history of bankruptcy," the court found that a special fiscal agent was warranted given the
"imminent danger" of "property being diminished in value or squandered."  *Id.*

Here, the Court finds for similar reasons that a special fiscal agent would serve the purpose
of closely supervising Nostrum Laboratories to monitor the company's operations and to prevent
the further erosion of assets that may be utilized to repay Plaintiff's loans.  The Court will empower
the fiscal agent to audit Nostrum Laboratories and to track the outflow of its assets—giving the
agent an opportunity to alert the Court if it becomes necessary to take further equitable action.  The
Court sees little chance that a fiscal agent will do more harm than good because, as in *Fimbel*, the
"agent's duties will be restricted to investigation, observation, and oversight."  2016 WL 1379788,
at *7.  Nostrum Laboratories will also not incur additional burdens because "providing information

to the special fiscal agent will not be a significant addition to the discovery costs that [it] has already undertaken [and will undertake] in the instant litigation.  And, such costs are greatly outweighed by the protections offered by the appointment of a special fiscal agent." *Id.*  The Court will also split the cost of the special fiscal agent evenly between the parties, with the understanding that the parties may seek to recoup the cost as part of any judgments.

Such an appointment is justified by record evidence that shows that Nostrum Laboratories' assets have declined in value; that Nostrum Laboratories has been in a financially unstable position and struggled with cash flow issues since at least 2022; that Nostrum Laboratories has pledged collateral to the DOJ that was promised to Plaintiff and incurred debts to other vendors, resulting in at least one confession of judgment to a former logistics provider; and that Nostrum Laboratories' financial projections in December 2022 were potentially not realistic based on information that was then-known to it.  Taken together, these factors favor interim equitable relief in the form of oversight and monitoring to ensure that Plaintiff's secured interest in Nostrum Laboratories' assets is not jeopardized during the pendency of this litigation.

The Court will issue a separate order naming the special fiscal agent and delineating the authority and responsibilities of the agent.  The parties will be given an opportunity to determine if they can agree on the individual to be appointed as the fiscal agent.

### C.  STAY PENDING APPEAL

Defendants ask the Court to stay any appointment pending an appeal, but do not meaningfully address the factors for a stay.  (*See* ECF No. 83 at 24.)  In any event, the Court sees no basis for a stay.  The Court is not appointing a receiver to take control of Nostrum Laboratories or to replace its management.  Instead, the special fiscal agent will be empowered to closely

monitor the company's affairs and assets and to alert the Court if additional equitable relief becomes warranted.  This is an appropriate remedy under the circumstances.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, and other good cause shown, Plaintiff's Motion to Appoint Receiver (ECF No. 11) is **GRANTED** in part and **DENIED** in part.  An appropriate Order follows.


Dated:  June 27, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE